IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ABRAHIM FATA,                          :
    Plaintiff,                         :
                                       :
    v.                                 :          CIVIL ACTION NO. 26-2185
                                       :
EDWIN ARCELLY, *et al.*,                :
    Defendants.                        :

**MEMORANDUM**

**HENRY, J.**                                                    **JUNE 25, 2026**

Plaintiff Abrahim Fata commenced this *pro se* civil action against numerous Defendants, asserting that this case primarily arises under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c); the Civil Rights Act of 1871, 42 U.S.C. § 1985(3); and the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595. (*See* ECF No. 2 ("Compl.") at 1.) Fata also filed a motion for leave to proceed *in forma pauperis*. For the following reasons, the Court will grant Fata leave to proceed *in forma pauperis* and dismiss his Complaint.

I.    FACTUAL ALLEGATIONS[1]

Fata's assertions initially relate to the formulation of home plans while he was still in custody, and he alleges that the actions of several defendants "obstruct[ed] the legal 'home plan' process," causing him to remain improperly in custody rather than released on parole prior to the

---

[1] The allegations set forth in this Memorandum are taken from Fata's Complaint (ECF No. 2) and state court dockets of which this Court may take judicial notice. *See Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006). The Court has also considered the Exhibits filed by Fata on April 8, 2026. *See* ECF No. 5. The Court adopts the sequential pagination assigned to the Complaint by the CM/ECF docketing system. Grammar, spelling, and punctuation errors in quotes from Fata's submissions are cleaned up where necessary.

1

end of his maximum custodial sentence.  (*See generally* Compl. at 2-6.)  Following his release, Fata alleges that several other defendants denied him "legal protection" and either impeded his entry into residential programs or evicted him from programs for arbitrary reasons.  (*Id.*)  Fata claims that all his difficulties in obtaining home plans and securing post release housing are tied to a conspiracy that is "orchestrated to keep [him] in a crisis," and "block the federal courts from hearing [his] case."  (*Id.* at 17.)

Fata is a frequent litigator in this Court.  As in his prior cases, Fata continues to allege the existence of a conspiracy that began in 2017 "to coverup a sexual abuse on [his] two kids and to frame [him]" (hereinafter referred to as the "2017 conspiracy").  (*Id.* at 18.)  He contends that he's "been severely oppressed by Pennsylvania, and New Jersey societies/communities, and governments, since 2017 . . . to the extreme of [his] death, by either manipulating a fatal 'accident' or . . . to push [him] to suicide."  (*Id.*)  Fata claims that the conspiracy "started with a Christian religious-based organization, that has invaded the communities" where he and his children reside, and he further alleges that this organization has recruited many relatives and government officials to form an enterprise to "oppress [him] religiously, psychologically, [and] systematically."[2]  (*Id.*)

In his current Complaint, Fata names as Defendants several staff members of Lehigh County Jail ("LCJ") including Edwin Arcelly (identified in the Complaint as a case worker); Bob

---

[2] The allegations in Fata's "2nd Statement of Claim" (*see* Compl. at 18) are repetitive to those made in Fata's prior cases.  *See* Civil Action Nos. 24-2402, 24-4862, 24-6934, 24-6935, and 24-6936.  In these cases, Fata alleged that more than fifty different individuals, family members, attorneys, state and federal law enforcement agencies, and governmental entities from Pennsylvania and New Jersey had participated in a years-long conspiracy to cover up a 2017 crime inflicted on his son.  In each case, the Court dismissed Fata's conspiracy claims as factually baseless.  Fata appealed the dismissal of his Complaint in each case, and the United States Court of Appeals for the Third Circuit affirmed in all cases.

Krasley (identified as a case worker); Tracy Kester (identified as a substitute case worker); Doug Matte and Jim Kremers (identified as "treatment team" members); and Kyle A. Russell (identified as the Warden).  (*Id.* at 2.)  He also names as Defendants Lehigh County "legal/administrative officials" Marsha Evans (identified as "probation/parole"); District Attorney Jay Jenkins; "Jessica" from "SPORE"[3] and Allentown Police "Detectives" John Lenord, Elizabeth Flores, and "Manning."  (*Id.* at 2-3.)  Fata also names as Defendants four staff members from the Allentown Rescue Mission ("ARM"), identifying them by first name only—Jose ("Intake Manager"), Heather, Sesa, and Paul.  (*Id.* at 3.)  Finally, he names several "private/institutional staff" members as Defendants including Jess (identified as the Director for the Allentown YMCA); Tiffany (identified as the Supervisor for Bethlehem YMCA); Hanna (identified as the supervisor for Bethlehem Shelter); Mr. Valentine (Victory House); Mr. Meyers (Stephen's House); and James Goss (identified "as a 'lead' and member of the enterprise" who "appear[ed] at the Allentown Rescue Mission chapel to manipulate [Fata]").  (*Id.*)

Public dockets reflect that Fata was incarcerated at LCJ in connection with probation revocation proceedings.  *See Commonwealth v. Fata*, No. CP-39-CR-0004857-2017 (C.P. Lehigh).  On January 16, 2024, Fata's probation was revoked, and he was sentenced to nine to twenty-three months imprisonment.  *Id*.  Fata claims that he was eligible for early release on July 25, 2024.  (Compl. at 6.)  In May 2024, Arcelly provided Fata with some home plan options and told him to "file for early release."  (*Id.*)  Fata filed a motion for parole, and a hearing was

---

[3] The Specialized Program Offering Recovery and Education ("SPORE") "is a partnership between the Office of Lehigh County Mental Health and the Juvenile Probation Department that provides a mental health caseworker and a probation officer to jointly and intensively supervise consumers who experience severe [mental health] problems."  *See* Lehigh County, Pennsylvania, https://www.lehighcounty.org/Departments/Human-Services/Mental-Health/Adult-Mental-Health/-Case-Management (last visited June 12, 2026).

3

scheduled for July 11, 2024 before Lehigh County Court of Common Pleas Judge Thomas M. Caffrey.  (*Id.* at 6-7.)  At the hearing, Fata asked Judge Caffrey if he could be released to ARM, but District Attorney Jenkins allegedly responded that it "wasn't a good idea."  (*Id.* at 7.)  Fata alleges that Evans and Jenkins "blocked his release path" when Evans asserted that shelters were not an option for home plans[4] and when Jenkins made a statement on the record.  (*Id.* at 2, 19.)  Fata's request for parole was denied.  (*Id.* at 7.)  Fata further claims that Jessica from SPORE falsely claimed that he had a "mental issue" to justify his exclusion from orientation programs.  (*Id.* at 2, 19.)

Fata claims that after he "return[ed] from court," Arcelly ignored him for a week and refused to provide him "with the list of other [home] options."  (*Id.* at 2, 7-8.)  He contends that Arcelly sabotaged his release by "withholding home plan lists" and by obstructing his "ability to communicate with his bank" to arrange for rental payments.  (*Id.* at 2, 19.)  Fata claims that Kester, who substituted for Arcelly while he was away on vacation, "oppressed [him]" by providing false information and by failing to give him a list of home plan options.  (*Id.* at 2, 7.)  Fata avers that Matte and Kremers, who supervised the case workers, ignored him and "provided misinformation to subsequent staff . . . to perpetuate [his] 'crisis.'"  (*Id.*)  Fata alleges that between July and September 2024, "[he] wrote grievances" regarding the failed attempts to contact his bank and retrieve home plans.  (*Id.* at 8.)  All his grievances were "denied or rejected wrongfully" by Warden Russell, and Russell dismissed "all grievances regarding the enterprise's interference."  (*Id.* at 2, 8, 19.)  In December 2024, Krasley began "to oppress [Fata] by sending indirect messages" about home plan options.  (*Id.* at 9-10.)  Fata claims that Krasley blocked his

---

[4] Public dockets reflect that Judge Caffrey entered orders on October 23, 2024 and November 20, 2024 denying Fata's motions for release to ARM.  *See Fata*, No. CP-39-CR-0004857-2017.

release by, *inter alia*, "claiming ignorance of available agencies while providing them to other inmates," seizing his resources list, and utilizing punitive lockdown. (*Id.* at 2, 19.) Fata claims that by March 2025, he stopped researching home plan options because he was about to "max out." (*Id.* at 10.) Fata was released from LCJ on September 25, 2025, the end date of his custodial sentence. (*Id.*)

Following his release from jail, Fata walked to ARM but was denied admittance by Jose because of a "fraudulent background check." (*Id.* at 3, 10, 19.) Jose also questioned Fata's "mental health to impede entry." (*Id.* at 3.) Fata went to the Allentown Police Department ("APD") to clear up his background history, and after explaining to Jose that a prior assault charge was dismissed, Fata was permitted entry to ARM. (*Id.* at 10-11.) Fata alleges that ARM staff members didn't like him, and he was "falsely accused" of harassment as a "pretext for program exclusion." (*Id.* at 3.) He claims that other staff members verbally insulted him, and "started singling [him] out and oppressing [him] for eating late" or "for getting more than one cup of water." (*Id.* at 3, 12.) While residing at ARM, Fata filed several incident reports with the APD. (*Id.* at 11.) He avers that he "was oppressed by the officers" who "question[ed] [his] mental health." (*Id.* at 11.) Fata alleges that he filed a report because "information was deleted from [his] phone" and later filed another report because an ARM volunteer, James Goss, tried to befriend Fata even though that individual "and his daughter started a conspiracy against [Fata] with a church back in 2017." (*Id.*) Fata avers that Goss acted as a "direct liaison between the 2017 conspiracy and current events." (*Id.* at 19.) Fata claims that the incident reports he made regarding Goss and others were disregarded by Detectives Lenord, Flores, and Manning, averring

5

that they "ignored physical evidence of organized crime to protect the enterprise."[5]  (*Id.* at 11, 19.)  On November 17, 2024, Fata was "kicked out" of ARM, allegedly "for no legit reason" and he was banned for a year.  (*Id.* at 12-13.)

Fata then went to the Allentown YMCA and met Jess, the YMCA Director.  (*Id.* at 12.)  Upon arrival, Fata told Jess that he "was a victim of organized crime and there was a conspiracy against [him]."  (*Id.* at 12-13.)  He got along initially with everyone at the YMCA until a "staff member conspired with Jess to oppress [Fata], and Jess started insulting [him]."  (*Id.* at 3, 13, 19.)  Fata alleges that Jess continually insulted him and prevented him from showering, until he "was kicked out on November 30th."  (*Id.*)  On December 1, 2025, Fata went to the APD and made another incident report because information was missing from his phone.  (*Id.* at 13.)

Fata next went to the Bethlehem Emergency Shelter and advised the staff, including the shelter's supervisor, Hanna, about the "conspiracy" against him.  (*Id.*)  At some point during his stay, Hanna told Fata that there were multiple complaints about him from other residents.  (*Id.* at 14-15.)  Fata claims that a resident named Dave "never stopped provoking" him.  (*Id.* at 15.)  After his conversation with Hanna, he allegedly found a bible in the area where he usually did his "legal work," and he claims that the placement of the bible was "orchestrated specifically for [him]" in connection with the 2017 conspiracy formed against him.  (*Id.* at 15, 18.)  Fata received several warnings[6] during his stay at the Bethlehem Emergency Shelter and was suspended from the shelter on February 11, 2026.  (*Id.* at 15.)  He asked Hanna to provide the names of staff

---

[5] Fata avers that the detectives denied him legal protection, ignored his request for a PFA against Goss, and "discarded physical evidence provided on an SD card regarding the 2017 conspiracy." (Compl. at 3.)

[6] Fata received warnings for leaving the shelter after 7:00 a.m., not making his bed, bringing food into the shelter and eating it in the hallway, printing documents at 1:00 a.m., using his cell phone, and smoking cigarettes. (Compl. at 14-16.)

members who "singled [him] out" because he "needed it for [his] case." (*Id.* at 3, 15-16.) Hanna did not respond to him until February 23, 2026, and because of the "abnormally prolonged response" and refusal "to identify provocateurs," Fata "knew" that "Hanna was part of the conspiracy against [him]." (*Id.* at 3, 16.) On March 16, 2026, Fata told Hanna that he was "being targeted" and that the rules were being used "as a weapon" against him. (*Id.* at 3, 17, 19.) Fata also told Hanna that people at the shelter were hacking his phone, and he planned to set up "boobie traps" to find out who was in on the conspiracy. (*Id.* at 17.) Hanna told him that he had to leave the shelter that night because he would not follow the rules. (*Id.*) When Hanna suggested the Allentown YMCA, he responded that he would not go there because "they're in on this conspiracy." (*Id.*) Fata avers that all Defendants are aware of the 2017 conspiracy, and they "agreed to a 'meeting of the minds' to utilize their official and private capacities to block [his] release and housing stability." (*Id.* at 20.)

Based on the foregoing allegations, Fata asserts six claims for relief. (*Id.* at 3-5.) The first three claims allege violations of federal criminal statutes. His first claim, "Federal Trafficking and Hostage-Taking," asserts that Defendants "utilized the legal 'home plan' requirement" to "perpetuate [his] detention through coordinated sabotage" in violation of federal criminal statutes that prohibit hostage taking (18 U.S.C. § 1203), forced labor (18 U.S.C. § 1589), and human trafficking (18 U.S.C. § 1595). (*Id.* at 3-4.) He also contends that Defendants Jose, Jess, and Hanna "maintained control via a 'crisis loop' of coordinated evictions" to prevent him from advancing his legal claims and to keep law enforcement from investigating the 2017 conspiracy. (*Id.* at 4, 17.) Fata's second claim, "Federal Stalking and Psychological Coercion," alleges that Defendants used "gaslighting and the creation of 'boobie traps'" to place him under substantial emotional distress in violation of the federal criminal statute that prohibits stalking (18 U.S.C. §

7

2261A).  (*Id.* at 4.)  He claims that the orchestration of insults by Defendant Jess and certain residents "were tactical weapons" used to impede his "legal standing."  (*Id.*)  His third claim, "Tampering with Victims and Witnesses," alleges that even though the Defendants were aware of Fata's statements regarding the 2017 conspiracy, they "engaged in misleading conduct— including 'filibustering' and misrepresentation of criminal history—to hinder reporting federal offenses" in violation of the federal statute that criminalizes witness tampering (18 U.S.C. § 1512).  (*Id.*)

Fata's fourth claim asserts a civil rights conspiracy in violation of 42 U.S.C. § 1985(3). (*Id.*)  He contends that "[t]he conspiracy was motivated by class-based (religious) animus," alleging that the "acceptance of an inmate with identical religious views" into a home plan that Fata was denied acceptance into is evidence of a conspiracy.  (*Id.*)  Fata further alleges that an email from "Jessica (S.P.O.R.E.) to [ARM] establishes the 'nexus' for state-private liability." (*Id.*)  The fifth claim asserts cruel and unusual punishment in violation of the Eighth Amendment, allegedly because Fata was moved to "'the hole' (3C) on September 27, 2024, without penological justification."  (*Id.*)  He also alleges deliberate indifference because the Defendants "knowingly exacerbat[ed] sleep deprivation—which required a Seroquel prescription—through institutional sabotage."  (*Id.*)  Finally, in the sixth claim, Fata alleges Fourteenth Amendment due process and equal protection violations.  (*Id.* at 4-5.)  He avers that Defendants arbitrarily denied and obstructed "the legal 'home plan' process" and failed to "provide meaningful administrative review."  (*Id.*)  He also avers that Arcelly and Evans treated him "differently than other similarly situated inmates by claiming facilities were not approved home plans while releasing others to those same facilities."  (*Id.* at 5.)

Fata claims that because of a "pattern of racketeering," he suffered financial losses including "lost wages from Auto Zone, the depletion of PNC bank funds, and increased transportation costs" because he was "forcibly moved further from his place of employment." (*Id.* at 5, 19-20.)  He seeks monetary, punitive, and treble damages in an unspecified amount, and seeks "a permanent injunction against the Defendants to cease all psychological and systemic oppression." (*Id.* at 5.)  He also requests that the Court "refer the evidence of criminal violations identified" for criminal prosecution by the United States and/or Pennsylvania Attorney General. (*Id.*)

## II.    STANDARD OF REVIEW

The Court will grant Fata leave to proceed *in forma pauperis* because it appears that he is incapable of paying the fees to commence this civil action.  Accordingly, 28 U.S.C. § 1915(e)(2)(B) requires the Court to screen and dismiss the Complaint if it is frivolous, malicious, fails to state a claim, or seeks relief from an immune defendant.  Section 1915(e)(2)(B)(i) requires the Court to dismiss Complaint if it is frivolous, and § 1915(e)(2)(B)(ii) requires dismissal if a complaint fails to state a claim upon which relief may be granted.  A complaint is frivolous if it "lacks an arguable basis either in law or in fact." *Brown v. City of Philadelphia*, 750 F. App'x 171, 173 (3d Cir. 2018) (quoting *Neitzke v. Williams*, 490 U.S. 319, 325 (1989)).  The use of the term "frivolous" in § 1915 "embraces not only the inarguable legal conclusion, but also the fanciful factual allegation." *Neitzke*, 490 U.S. at 325.  Section 1915 accords judges "the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless[,]" including claims that describe "fantastic or delusional scenarios[.]" *Id.* at 327-28; *see also Mitchell v. Horn,* 318 F.3d 523, 530 (3d Cir. 2003).  "[A] finding of factual frivolousness is appropriate when the facts alleged rise to the level of the

9

irrational or the wholly incredible, whether or not there are judicially noticeable facts available to contradict them." *Smith v. N. Cambria Police,* No. 25-1273, 2025 WL 1324070, at *1 (3d Cir. May 7, 2025) (*per curiam*) (quoting *Denton v. Hernandez*, 504 U.S. 25, 33 (1992)).  A claim is legally baseless if it is "based on an indisputably meritless legal theory." *Deutsch v. United States*, 67 F.3d 1080, 1085 (3d Cir. 1995) (holding frivolous a suit alleging that prison officials took an inmate's pen and refused to give it back).

Whether the Complaint fails to state a claim under § 1915(e)(2)(B)(ii) is governed by the same standard applicable to motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), *see Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999), which requires the Court to determine whether the Complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 560 U.S. 544, 556 (2007)).  At the screening stage, the Court will accept the facts alleged in the *pro se* Complaint as true, draw all reasonable inferences in the plaintiff's favor, and ask only whether the Complaint, liberally construed, contains facts sufficient to state a plausible claim.  *Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021), *abrogation on other grounds recognized by Fisher v. Hollingsworth*, 115 F.4th 197 (3d Cir. 2024).

As Fata is proceeding *pro se*, the Court construes his allegations liberally.  *Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021) (citing *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244-45 (3d Cir. 2013)).  The Court will "apply the relevant legal principle even when the complaint has failed to name it." *Id.* (quoting *Mala*, 704 F.3d at 245).  However, conclusory allegations do not suffice.  *Iqbal*, 556 U.S. at 678; *see also Martinez v. UPMC Susquehanna*, 986 F.3d 261, 266 (3d Cir. 2021) ("A plaintiff cannot survive dismissal just by alleging the conclusion to an ultimate legal issue.").  "[P]ro se litigants still must allege sufficient facts in their complaints to support a

10

claim." *Vogt*, 8 F.4th at 185 (quoting *Mala*, 704 F.3d at 245).  An unrepresented litigant "cannot flout procedural rules — they must abide by the same rules that apply to all other litigants."  *Id.* (quoting *Mala*, 704 F.3d at 245); *see also Doe v. Allegheny Cnty. Hous. Auth.*, No. 23-1105, 2024 WL 379959, at *3 (3d Cir. Feb. 1, 2024) ("While a court must liberally construe the allegations and 'apply the applicable law, irrespective of whether the pro se litigant mentioned it b[y] name,' *Higgins v. Beyer*, 293 F.3d 683, 688 (3d Cir. 2002), this does not require the court to act as an advocate to identify any possible claim that the facts alleged could potentially support.").

## III.    DISCUSSION

### A.    Frivolous Claims

Fata contends that there is a vast conspiracy to frame him and cover up sexual abuse. (Compl. at 18.)  He asserts that the conspiracy, which spans across two states, was started in 2017 by a "Christian religious-based organization" that recruited family members and government officials to oppress him "to the extreme of [his] death, by either manipulating a fatal 'accident' or 'situation'" or push him to commit suicide.  (*Id.*)

Fata asserts a civil RICO claim based on this conspiracy, alleging that an "association-in-fact enterprise," consisting of all Defendants together with a "Christian religious organization," has been operating "with a shared goal (cover up of 2017 case) where state actors act as 'gatekeepers' and private actors act as 'enforcers.'" (*Id.* at 20.)  He avers that the Defendants "agreed to a 'meeting of the minds' to utilize their official and private capacities to block [his] release and housing stability." (*Id.*)  Fata contends that the enterprise has committed

11

"racketeering acts" designed to sabotage "home plans and housing" to keep him "in a perpetual state of 'crisis' to impede his legal access to federal courts." [7] (*Id.* at 17, 20.)

As the Court has advised Fata on numerous prior occasions, his allegations that a multistate conspiracy has been formed to push him to suicide or otherwise cause his death are wholly incredible and lack a basis in fact. Accordingly, the Court will dismiss any claims based on these allegations as factually baseless, without leave to amend. *See, e.g., Caterbone v. Nat'l Sec. Agency*, 698 F. App'x 678, 679 (3d Cir. 2017) (*per curiam*) (dismissing appeal as lacking an arguable basis in fact where underlying allegations were based on plaintiff's assertion that he was a "victim of U.S. sponsored mind control and cointelpro harassment program"); *Mina v. Chester County*, 679 F. App'x 192, 195 (3d Cir. 2017) (*per curiam*) (affirming dismissal of plaintiff's claims that 62 defendants had a vast conspiracy against him spanning twenty years); *Price v. Fed.*

---

[7] As part of his assertion that he was being "oppressed by the staff" at LCJ, Fata avers that he was "wrongfully" moved to "the hole" on September 27, 2024, "without penological justification." (Compl. at 4, 8.) He also alleges Defendants "knowingly exacerbate[ed] sleep deprivation— which required a Seroquel prescription—through institutional sabotage." (*Id.*) Fata's passing references to "cruel and unusual punishment" and "deliberate indifference" are unsupported by underlying allegations and thus insufficient to assert a plausible claim. *See Higgins v. Bayada Home Health Care Inc.*, 62 F.4th 755, 763 (3d Cir. 2023) ("A passing reference to an issue will not suffice to bring that issue before this court.") (cleaned up) (quoting *Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d Cir. 1994)).

Moreover, in the prison context, "[d]ue process protection for a state created liberty interest is . . . limited to those situations where deprivation of that interest 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Griffin v. Vaughn*, 112 F.3d 703, 706 (3d Cir. 1997) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). "[C]onfinement in administrative or punitive segregation will rarely be sufficient, without more, to establish the kind of 'atypical' deprivation of prison life necessary to implicate a liberty interest." *Smith v. Mensinger*, 293 F.3d 641, 653 (3d Cir. 2002) (quoting *Sandin*, 515 U.S. at 486). In *Sandin*, the Supreme Court concluded that placement in disciplinary segregation for thirty days did not deprive the inmate of a protected liberty interest. *See Sandin*, 515 U.S. at 486; *see also Williams v. Bitner*, 307 F. App'x 609, 611 (3d Cir. 2009) (no liberty interest triggered by 90-day placement in disciplinary segregation); *Smith*, 293 F.3d at 654 (no liberty interest triggered by seven-month placement in disciplinary confinement).

12

*Bureau of Investigation*, No. 20-3015, 2020 WL 4368063, at *3 (E.D. Pa. July 30, 2020), *aff'd*, 845 F. App'x 106 (3d Cir. 2021) (finding plaintiff's allegations to be factually frivolous where plaintiff asserted that "numerous law enforcement agencies, attorneys, prison officials, and medical professionals have used neurological and psychological technology to control the 'four basic groups of his brain and mental functions' and "that the use of this 'technology' and 'mind control' has caused him numerous impairments and drove him to criminal and erratic behavior"); *Jorge v. Torres*, No. 18-14674, 2019 WL 2385942, at *3 (D.N.J. June 6, 2019) ("Plaintiff's factual allegations that the Police are monitoring his every move and that the Police do so by telephone recruitment 'of informants, spies, and willing constituates [sic]' is exactly the type of 'fantastic or delusional scenario[ ]' warranting dismissal under 28 U.S.C. § 1915(e)(2)(B)(i)." (alterations in original)).

Moreover, Fata's RICO claims are legally baseless. RICO "makes it unlawful 'for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.'" *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 362 (3d Cir. 2010) (quoting 18 U.S.C. § 1962(c)). To state a civil RICO claim, a plaintiff must plausibly allege the following elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Id.* (internal quotations omitted). "'Racketeering activity' is defined in the RICO statute to comprise the state law offenses of murder, kidnaping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, and dealing in a controlled substance or listed chemical, as well as several federal offenses such as mail and wire fraud." *Talley v. Halpern ex rel. Est. of Winderman*, No. 05-4184, 2005 WL 2002611, at *4 (E.D. Pa. Aug. 16, 2005) (citing 18 U.S.C. § 1961(1)). "According to the RICO

13

statute, a 'pattern of racketeering activity' requires at least two acts of racketeering activity within a ten-year period." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 363 (quoting 18 U.S.C. § 1961(5)).  Additionally, a plaintiff must have sustained "injury to business or property" caused by the alleged RICO violation to bring a RICO claim. *Maio v. Aetna, Inc.*, 221 F.3d 472, 482–83 (3d Cir. 2000).

Fata does not allege any conduct that could be considered racketeering activity for purposes of setting forth a legal basis for a RICO claim.  *See Tapia-Ortiz v. Winter*, 185 F.3d 8, 11 (2d Cir. 1999) ("The claim that the defendants [including numerous judges, staff attorneys, and an assistant united states attorney] engaged in a RICO conspiracy by failing to properly address issues on appeal and 'bribing' witnesses to testify pursuant to plea agreements lacks any arguable basis in law and was properly dismissed as frivolous."); *Mierzwa v. Safe & Secure Self Storage, LLC*, 493 F. App'x 273, 276 (3d Cir. 2012) ("[C]onclusory allegations that defendants conspired for the purpose of defrauding [Mierzwa] are simply inadequate to plead a valid RICO claim.") Fata's conclusory allegations that more than twenty individuals employed by approximately ten different county, city, or private entities conspired with an unidentified "Christian religious-based organization" for the purpose of sabotaging his "home plans and housing" are inadequate to plead a valid RICO claim and he fails to allege any injury to his business or property.  Accordingly, his civil RICO claims will be dismissed as legally baseless, without leave to amend.  There are additional reasons, however, as to why Fata's claims cannot proceed.

## B.      Civil Claims Based on Criminal Statutes

Fata cites several federal criminal statutes in his Complaint, namely 18 U.S.C. § 1203 (hostage taking), § 1512 (witness tampering), § 1589 (forced labor), and § 2261A (stalking). (Compl. at 1-2).  To the extent he seeks to assert civil liability based on those statutes, his claims

14

are not plausible because criminal statutes generally do not give rise to a basis for civil liability. *See Brown v. City of Philadelphia Office of Human Res.*, 735 F. App'x 55, 56 (3d Cir. 2018) (*per curiam*) ("Brown alleges that the defendants violated various criminal statutes, but most do not provide a private cause of action."). Indeed, the United States Supreme Court has stated that, unless specifically provided for, federal criminal statutes rarely create private rights of action. *Nashville Milk Co. v. Carnation Co.*, 355 U.S. 373, 377 (1958) (stating that where a statute "contains only penal sanctions for violation of it provisions; in the absence of a clear expression of congressional intent to the contrary, these sanctions should under familiar principles be considered exclusive, rather than supplemented by civil sanctions of a distinct statute"); *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 190 (1994) ("We have been quite reluctant to infer a private right of action from a criminal prohibition alone."). The fact that a federal statute has been allegedly violated and some person harmed does not automatically give rise to a private cause of action for the injured person. *Touche Ross & Co. v. Redington*, 442 U.S. 560, 568 (1979); *Cannon v. University of Chicago*, 441 U.S. 677, 689 (1979).

Claim one of Fata's Complaint asserts federal trafficking and hostage taking in violation of 18 U.S.C. §§ 1203, 1595, and 1589. (Compl. at 3-4.) However, the hostage taking statute, § 1203, does not give rise to civil liability. *Rodriguez v. City of Salem*, No. 23-01863, 2024 WL 4546365, at *4 (D. Or. Oct. 2, 2024), *report and recommendation adopted*, 2024 WL 4544317 (D. Or. Oct. 22, 2024) (concluding that 18 U.S.C. § 1203 "is part of federal criminal code, and there is no indication of a congressional intent to create a private right and private remedy"); *Kelly v. City of New Philadelphia,* No. 11-474, 2011 WL 3705151, at *2 n.3 (N.D. Ohio Aug. 22, 2011) (stating that 18 U.S.C. § 1203 does not provide for "a private right of action"). Fata's claims

pursuant to the TVPRA, which encompasses 18 U.S.C. §§ 1589 and 1595, are also not plausible. Specifically, § 1589 does not provide a basis for a private cause of action. *See Brown v. U.S. Dist. Ct. for the E. Dist. of Pa.*, No. 18-747 (E.D. Pa.) (Apr. 19, 2018 Order at 6 (dismissing claims under 18 U.S.C. § 1589 as "meritless and frivolous")), *aff'd*, 740 F. App'x 239, 240 (3d Cir. 2018) (*per curiam*). Although 18 U.S.C. § 1595 provides for a civil remedy for violations of the TVPRA, Fata fails to allege any facts suggesting that Defendants either forced him into labor, trafficked him for forced labor, or benefitted financially from peonage or forced labor.[8] *See Brown v. U.S. Dist. Ct. for E. Dist. of Pa.*, No. 18-1108, 2018 WL 11463543, at *3 (E.D. Pa. Apr. 19, 2018), *aff'd sub nom.*, *Brown v. City of Phila. Off. of Hum. Res.*, 735 F. App'x 55 (3d Cir. 2018).

In Fata's second claim, he alleges federal stalking and psychological coercion in violation of 18 U.S.C. § 2261A, but, again, there is no private right of action under that statute. *See Weisman v. Baur*, 2021 WL 3403519, at *2 (E.D. Pa. Aug. 4, 2021) (dismissing civil claim brought under 18 U.S.C. § 2261A); *Humphrey v. Pa. Ct. of Common Pleas of Phila.*, 2021 WL 268498, at *2 n.3 (E.D. Pa. Jan. 27, 2021) ("[N]umerous federal courts have held that no private right of action exists under [the Violence Against Women Act, 18 U.S.C. §§ 2261-2262].").

Finally, in claim three, Fata asserts tampering with victims and witnesses in violation of 18 U.S.C. § 1512. (Compl. at 4.) However, the federal witness tampering statute, § 1512, does not provide a private cause of action. *Shaw v. City of Philadelphia*, No. 25-2941, 2025 WL 1689393, at *3 (E.D. Pa. June 13, 2025) (citing *Palencia v. N. Point Veterans Program-Turning*

---

[8] As a convicted inmate in custody for a parole violation, Fata also has no constitutional claim arising from forced labor while he was incarcerated. *See Dmytryszyn v. Hickenlooper*, 527 F. App'x 757, 760 (10th Cir. 2013) (holding that in the context of a convicted prisoner, the courts have held that prisoners have no Thirteenth Amendment or liberty or property interest in payment for their work and may be lawfully compelled to work) (nonprecedential).

*Point*, No. 20-1691, 2020 WL 7059557, at *1 (W.D. Pa. Dec. 2, 2020) ("18 U.S.C. § 1512 is a criminal statute that does not create a private cause of action.")).

Fata also cites 18 Pa. Cons. Stat. §§ 4911 (tampering with public records or information) and 5301 (official oppression) as a basis for claims.  (Compl. at 2.)  Courts, including the United States Court of Appeals for the Third Circuit, routinely dismiss claims seeking to impose civil liability under various sections of the Pennsylvania Crimes Code, finding that the "Code gives no authority for a private cause of action and none has been implied."  *Youst v. Roth*, No. 23-0848, 2023 WL 3821813, at *4 (E.D. Pa. June 5, 2023) (quoting *Martrano v. Quizno's Franchise Co.*, No. 08-0932, 2009 WL 1704469, at *12 (W.D. Pa. June 15, 2009)); *see also Williams v. Wetzel*, 827 F. App'x 158, 162 (3d Cir. 2020) (*per curiam*) (recognizing that plaintiff's civil claims brought pursuant to the Pennsylvania Crimes Code were properly rejected by the district court because there was no private right of action available under the Code); *Abouloh v. Lehigh Cnty. Prison*, No. 25-3377, 2025 WL 2654904, at *8 (E.D. Pa. Sept. 15, 2025).  Accordingly, Fata's claims based on these criminal statutes will be dismissed with prejudice.

Similarly, any claims alleging criminal liability or a violation of a criminal statute as a basis for civil liability are dismissed with prejudice.  (*See* Compl. at 5 wherein Fata seeks relief in the form of "criminal investigation and prosecution.")  "A private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."  *See Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) (finding that a citizen lacks standing to contest prosecutorial policies "when he himself is neither prosecuted nor threatened with prosecution.") (citations omitted).  Fata cannot compel a criminal investigation by filing a complaint with this Court because the United States District Courts have no authority to order any law enforcement agencies or prosecutors to initiate investigations or prosecutions.  *See Wagner v. United States*

17

*Gov't*, No. 23-1626, 2023 WL 3948820, at *1 (D.D.C. June 9, 2023) (citing *Otero v. U.S. Attorney General*, 832 F.2d 141, 141-42 (11th Cir. 1987); *Jafree v. Barber*, 689 F.2d 640, 643 (7th Cir. 1982)).  "[A]n agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."  *Wagner*, 2023 WL 3948820, at *1 (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)); *see also Smith v. Friel*, No. 19-943, 2019 WL 3025239, at *4 (M.D. Pa. June 4, 2019), *report and recommendation adopted*, 2019 WL 3003380 (M.D. Pa. July 10, 2019) (collecting cases and stating "courts have long held that a civil rights plaintiff may not seek relief in civil litigation in the form of an order directing the criminal prosecution of some third parties").

### C.    Civil Rights Conspiracy Claims

Fata's fourth claim alleges a civil rights conspiracy in violation of 42 U.S.C. § 1985(3). (Compl. at 1, 4.)  This section creates a cause of action against any two persons who "conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws. . . ."  42 U.S.C. § 1985(3).  To state a plausible claim under § 1985(3) a plaintiff must allege the following elements: (1) a conspiracy; (2) motivated by a racial or class based discriminatory animus designed to deprive, directly or indirectly, any person or class of persons of the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to a person or property or the deprivation of any right or privilege of a citizen of the United States.  *Lake v. Arnold*, 112 F.3d 682, 685 (3d Cir. 1997).  Significantly, the "language requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *United Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 835

18

(1983) (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971); *see also Farber v. City of Paterson*, 440 F.3d 131, 136 (3d Cir. 2006) (explaining that "§ 1985(3) defendants must have allegedly conspired against a group that has an identifiable existence independent of the fact that its members are victims of the defendants' tortious conduct"); *Hauptmann v. Wilentz*, 570 F. Supp. 351, 386 (D.N.J. 1983) ("If the conspiracy only affects the plaintiff individually, the allegations will not satisfy the class-based animus requirement."), *aff'd sub nom., Appeal of Hauptmann*, 770 F.2d 1070 (3d Cir. 1985).

Moreover, a plaintiff must allege specific facts to state a plausible § 1985(3) claim. *Robinson v. McCorkle*, 462 F.2d 111, 113 (3d Cir. 1972) ("With near unanimity, the courts have rejected complaints containing mere conclusory allegations of deprivations of constitutional rights protected under § 1985(3). A conspiracy claim based upon § 1985(3) requires a clear showing of invidious, purposeful and intentional discrimination between classes or individuals."); *Grigsby v. Kane*, 250 F. Supp. 2d 453, 458 (M.D. Pa. 2003) ("[O]nly allegations which are particularized, such as those addressing the period of the conspiracy, the object of the conspiracy, and actions taken in furtherance of the conspiracy, will be deemed sufficient."). "[T]o properly plead an unconstitutional conspiracy, a plaintiff must assert facts from which a conspiratorial agreement can be inferred." *Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 178 (3d Cir. 2010). "[A] bare assertion of conspiracy will not suffice." *Twombly*, 550 U.S. at 556. Fata's claims fail for several reasons. First, there is no allegation that a conspiracy was motivated by race or a class-based discriminatory animus as required by § 1985(3). Fata does not identify his race, nor does he make any allegation that race was the motivation behind the Defendants' alleged actions. Although Fata conclusively asserts that the "conspiracy was motivated by class-based (religious) animus" (Compl. at 4), the Complaint does not allege Fata's membership in any

19

religion, nor does it suggest that any of the Defendants named harbored discriminatory animus against him on the basis of his religion.[9] Also, Fata asserts the existence of a conspiracy only in conclusory terms and provides no facts from which a conspiratorial agreement may be inferred. *Groce v. City of Phila. L. Dep't*, No. 21-5132, 2022 WL 493418, at *7 (E.D. Pa. Feb. 17, 2022) (dismissing conspiracy claim as wholly conclusory where the plaintiff failed to alleged facts regarding the formation of a conspiracy between any Defendants or any other individuals, the period of the conspiracy, or actions taken by the alleged conspirators to achieve the alleged purpose thereof). Fata's § 1985(3) claims are not plausible and will be dismissed.

### D.    Due Process Claims

Fata alleges that the Defendants' actions in "arbitrarily denying and obstructing the 'legal' home plan process," resulted in the denial of his procedural due process rights under the Fourteenth Amendment. (Compl. at 4.) He also claims, without further explanation, that he was denied "meaningful administrative review." (*Id.* at 4-5.) Liberally construing his claims, Fata alleges that Defendants somehow caused him to remain improperly in custody rather than released on early parole at some point prior to the end of his maximum custodial sentence. The Court can discern no claim that rises to the level of a due process violation.[10]

---

[9] Fata avers that the "evidence" supporting this claim is "the acceptance of an inmate with identical religious views" into Jubilee Ministries, while Fata was denied acceptance. (Compl. at 4.) Fata alleges that he was provided an application by Krasley, and he filled out the application and provided his "perspective on religion." (*Id.* at 9.) He alleges that the other inmate with "the very same perspective" was granted admittance and released from prison. (*Id.*) Fata, however, received "an abnormal denial letter" from Mark Habecker, who is not named as a Defendant, indicating that Fata "was 'not teachable' following a review of [his] religious perspective essay." (*Id.* at 9, 25.)

[10] Fata also mentions that "Defendants Arcelly and Evans intentionally treated [him] differently than other similarly situated inmates" because they allegedly released other inmates to facilities while allegedly telling him that those facilities "were not approved home plans." (Compl. at 5.) Fata's mere recitation of the Fourteenth Amendment's Equal Protection Clause in the same claim

The Fourteenth Amendment to the United States Constitution provides that the State may not "deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV. An examination of a procedural due process claim under the Fourteenth Amendment proceeds in two steps. *See Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 571 (1972). First, the court must determine whether there exists a liberty or property interest which has been interfered with by the state. *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (citing *Bd. of Regents*, 408 U.S. at 571). Second, if and only if a petitioner establishes the existence of a protected interest, the court must examine whether the procedures attendant upon that deprivation were constitutionally sufficient. *Id.*

A convicted individual has no constitutionally protected liberty interest in parole or otherwise being released before the expiration of a valid sentence. *See Greenholtz v. Inmates of Nebraska Penal & Corr. Complex*, 442 U.S. 1, 7 (1979); *Thomas v. Buechele*, 569 F. App'x 93, 95 (3d Cir. 2014) (concluding no due process violation caused by delayed parole because the

---

as his due process claim fails to allege a separate plausible claim. To plead an equal protection violation plausibly, a prisoner must allege "that he was treated differently than other similarly situated inmates, and that this different treatment was the result of intentional discrimination based on his membership in a protected class." *Mack v. Warden Loretto FCI*, 839 F.3d 286 (3d Cir. 2016) (citing *Hassan v. City of New York*, 804 F.3d 277, 294, 298 (3d Cir. 2015)). "Persons are 'similarly situated' for purposes of an equal protection claim when 'they are alike in all relevant aspects.'" *Startzell v. City of Philadelphia*, 533 F.3d 183, 203 (3d Cir. 2008) (emphasis omitted). Fata does not allege that he is a member of a protected class or explain how he was discriminated against based on that membership. He also fails to allege how he was treated differently than other similarly situated inmates who were not in a protected class. *See Perano v. Twp. Of Tilden*, 423 F. App'x 234, 238 (3d Cir. 2011) ("At the motion to dismiss stage, Perano must allege facts sufficient to make plausible the existence of such similarly situated parties."); *Carson v. Mulvihill*, 488 F. App'x 554, 563 (3d Cir. 2012) (rejecting equal protection claim when inmate did "not allege facts showing that he was similarly situated to the inmates" who received accommodations "or that there was no rational basis for his different treatment"); *Beitler v. City of Allentown*, No. 22-104, 2022 WL 768151, at *8 (E.D. Pa. Mar. 14, 2022) ("We should dismiss the claim when an incarcerated person fails to identify similarly situated individuals being treated differently."). Accordingly, any equal protection claim must be dismissed.

plaintiff had "not alleged the deprivation of a protected liberty interest"). Thus, if prisoners in Pennsylvania have a protected liberty interest in some aspect of their parole, it must derive from Pennsylvania law. *See Sandin v. Conner*, 515 U.S. 472, 483-84 (1995) (recognizing that "States may . . . create liberty interests which are protected by the Due Process Clause").

The statutes governing Pennsylvania's Board of Probation and Parole, however, do not grant state prisoners any constitutionally protected liberty interest in being released on parole prior to the expiration of their controlling maximum sentences. *See Burkett v. Love*, 89 F.3d 135, 139 (3d Cir. 1996) (recognizing the general principle that the Pennsylvania parole statute does not create a liberty interest in the right to be paroled); *Coady v. Vaughn*, 770 A.2d 287, 289 (Pa. 2001) ("It is undisputed that [an inmate] does not have a clear legal right to the grant of parole, nor does the board have a corresponding duty to grant the same."). Since Fata has no constitutionally protected liberty interest in parole or any parole procedures, any due process violation based on Defendants' actions that allegedly led to his loss of parole necessarily must fail. *See*, *e.g.*, *Newman v. Beard*, No. 06-214, 2008 WL 2149605, at *2 (W.D. Pa. May 21, 2008) (claim for violation of due process based on deficient parole procedures in interview conducted by the Pennsylvania Board of Probation and Parole fails because there is no liberty interest in parole or any of its procedures); *Nellom v. Luber*, No. 02-2190, 2004 WL 816922, at *10 (E.D. Pa. Mar. 18, 2004) (due process claim based on parole procedures fails because there is no constitutionally protected liberty interest in either being granted parole or having a parole hearing). For these reasons, any claims related to the loss of parole do not allege a separate violation of Fata's due process rights or otherwise state a plausible constitutional claim.

22

### E.   Claims Based on Grievances

Fata asserts in part that Warden Russell "rejected wrongfully" numerous grievances he made with respect to his attempts to secure home plans.  (*See* Compl. at 8.)  The Court has already dismissed any due process claims against Defendants based on Fata's denial of parole. To the extent Fata also asserts a stand-alone claim based on the grievance process, it too is dismissed because "prisoners do not have a constitutional right to prison grievance procedures." *Gerholt v. Wetzel*, 858 F. App'x 32, 34 (3d Cir. 2021) (*per curiam*) (citing *Massey v. Helman*, 259 F.3d 641, 647 (7th Cir. 2001) and *Flick v. Alba*, 932 F.2d 728, 729 (8th Cir. 1991) (*per curiam*)). Accordingly, allegations such as those raised by Fata predicated on failures of the grievance process or improper handling of or response to grievances do not give rise to a constitutional claim.  *See Woods v. First Corr. Med. Inc.*, 446 F. App'x 400, 403 (3d Cir. 2011) (*per curiam*) ("We agree with the District Court that because a prisoner has no free-standing constitutional right to an effective grievance process, Woods cannot maintain a constitutional claim against Lucas based upon his perception that she ignored and/or failed to properly investigate his grievances." (internal citation omitted)); *Burnside v. Moser*, 138 F. App'x 414, 416 (3d Cir. 2005) (*per curiam*) (explaining that "[i]nmates do not have a constitutionally protected right to the prison grievance process" and that "a state grievance procedure does not confer any substantive constitutional right upon prison inmates" (internal quotations and citations omitted)).

23

## IV.   CONCLUSION

For the foregoing reasons, the Court will dismiss Fata's Complaint in its entirety as frivolous and for failure to state a claim, pursuant 28 U.S.C. § 1915(e)(2)(B)(i) and (ii).  Leave to amend will not be given as any attempt to amend would be futile.  *See Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108, 110 (3d Cir. 2002).  An appropriate order follows.